Filed 4/24/25  P. v. Martinez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS JAVIER MARTINEZ,<br><br>    Defendant and Appellant. | D080828<br><br><br>(Super. Ct. No. SCD278102) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed in part, reversed in part, remanded for resentencing.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Luis Javier Martinez appeals from a judgment entered after a jury convicted him of second degree murder, attempted murder, assault with a semiautomatic firearm, and unlawful possession of a firearm in connection with two separate 2018 shootings. The jury also found true a number of sentence enhancement allegations. The trial court sentenced Martinez to prison for a term of eight years, plus a term of 15 years to life.

On appeal, Martinez makes six claims of error. He first sets out four claims of evidentiary error, and then separately argues that even if these evidentiary errors are individually harmless, their cumulative effect is prejudicial and requires reversal. Sixth, Martinez contends the trial court erred in failing to conduct an ability-to-pay hearing before imposing certain fines and fees. The People have also appealed, arguing that the court committed three sentencing errors that require us to vacate the sentence and remand for resentencing.

We conclude the trial court erred in excluding one of Martinez's out-of-court denials of involvement in the murder despite it being offered as impeachment, but the error was harmless. We further conclude that even assuming Martinez has identified evidentiary error in another of his claims—i.e., that the prosecutor should not have been permitted to elicit from the gang expert testimony that he had never known a gang member to falsely take credit for a murder—such presumed error was also harmless. Further, even when considered jointly, these two errors—actual or presumed—do not require reversal of Martinez's convictions.

We agree with the People that the trial court failed to recognize the full extent of the discretion it possessed when sentencing Martinez in connection

2

with a Penal Code[1] section 12022.53, subdivision (d), firearm enhancement found true by the jury. Because the record does not clearly demonstrate the court would have made the same sentencing decisions had it understood the full breadth of its sentencing discretion, we vacate Martinez's sentence and remand for resentencing. For that reason, we need not consider the People's other two claims of sentencing error. Finally, we accept the People's concession that Martinez was entitled to an ability-to-pay hearing, and instruct the trial court to conduct such a hearing on remand. We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial Evidence*

A. *Martinez's Tagging Crew and AR-15 Rifle*

Martinez belonged to a tagging crew[2] called CMA and went by the moniker "Malo." At some point he founded and led a new tagging crew, South Francis (SF), which was named for the street where Martinez lived. SF was affiliated with another tagging crew that called itself 5D.

Rival tagging crews perpetuated their rivalries by crossing out each other's graffiti and engaging in fights with each other. Two of SF's main rivals were called Earn Their Respect or Easy to Right (ETR) and Nightlight Crew (NL).

As early as May 2017, Martinez obtained an AR-15 rifle. In April 2018, Martinez watched several YouTube videos about or involving AR-15s after

---

[1] Further undesignated references are to the Penal Code.

[2] A "tagging crew" was described at trial as a group of individuals who paint "graffiti" on "almost anything, except houses" throughout a neighborhood.

3

searching for the terms "AR-15," "[m]aking AR-15," "[b]uild or buy an AR-15," and "Ape With AK-47," among others.

B.    *April 23, 2018 Shooting*

On April 23, 2018, four members of ETR were in a black Toyota Camry parked in front of Brandon T.'s house, waiting for him to come out and join them. Brandon knew Martinez. Martinez had tagged Brandon's house twice, and they had been in physical fights with each other. Of the SF members, Brandon considered Martinez to be "the main aggressor" toward him.

As the ETR group was waiting for Brandon, a white Honda Accord, heading the same direction the Toyota was facing, slowly passed them. As the Honda passed by, its occupants were "mad dogging"[3] the ETR members. Martinez was identified as one of the Honda's occupants. After passing, the Honda executed a U-turn and, going the opposite direction the Toyota was facing, came to a stop next to the Toyota so that the driver windows were facing each other.

The driver of the Honda asked the driver of the Toyota, Edgar C., if he was from ETR. Edgar nodded his head, and the driver of the Honda replied, "fuck you from ETR." The driver also said, "This is 5D."

At that point, the four occupants of the Honda got out, including the driver, and started punching and kicking the Toyota. One of the occupants of the Honda was holding a "big gun," that looked "[l]ike an AR." A witness estimated the gun was approximately two and a half feet long. Edgar hit the accelerator and drove off in the Toyota. Seconds later, Brandon, still inside his house, and the occupants of the Toyota heard a single shot ring out. To

---

[3]    A witness gestured to demonstrate "mad dogging," and an attorney indicated that the witness was "[l]ooking around."

4

Brandon, who had experienced the sounds of different types of guns being fired during visits to a shooting range, "it sounded like a big gun."

Fernando R., who was sitting in the backseat of the Toyota, grabbed his chest and said, "I got hit." A bullet had traveled through the Toyota's trunk and a backseat, entering Fernando's back and shattering inside his body, sending a bullet fragment through his chest. Fernando later died. A deputy medical examiner who performed the autopsy testified that the cause of Fernando's death was a gunshot wound to the torso. Police officers did not find the bullet's cartridge casing.

C. *Martinez's Conduct After April 23 and through May 2018*

From the day after the April 23 shooting through early May 2018, Martinez searched for and viewed several news articles about Fernando's killing.

Four days after the shooting, Martinez informed someone through Facebook Messenger that he was on the run. He sent the person a video of the "little room" where he was staying. An object resembling an assault rifle could be seen as the camera panned around the room.

Martinez also engaged in multiple online conversations in which he alluded to having committed and/or participated in the April 23 shooting. For example, in one set of messages over Facebook Messenger, Martinez complained to Brandon about Brandon's "snitching ass big homie Dritz," called ETR members "lame," and asserted that he, Martinez, "didn't need no one when [he] ran up on [Brandon's] homies in front of [Brandon's] pad." In multiple other messages to various individuals, Martinez took credit for shooting Fernando and threatened others with a similar fate.

5

D.    *The June 5, 2018 Shooting*

Another shooting involving SF members took place on June 5, 2018. On that day, neighbors MC Perez (Rico) and Luiz M. were hanging out at the apartment complex where Luiz's parents lived. Rico tended to hang out with members of NL. Miguel, a friend of Rico's and an NL member, suspected that Martinez had vandalized his mother's house. Miguel asked Rico to come with him to Martinez's house to "squash the beef." Rico agreed, and Luiz and three others joined.

When the group of teens arrived at Martinez's home, Martinez's mother was outside. Rico explained to Martinez's mother that his "friend was bothered over [tagging that] had happened to his mom's house," and he was there because he knew both parties who were potentially involved. At that point, a group of two or three young men came out of Martinez's house and "looked mad." Martinez's mother called Martinez on the phone while one of Rico's friends grabbed bats from a neighbor's yard.

Martinez's mother was frustrated with the situation and put Miguel on the phone to talk to Martinez. Miguel told Martinez, "You want to keep doing your shit, let's squash it all," and at another point said, "Even your mom knows that I'm going to kick your ass." After the phone call ended, Rico and his friends apologized to Martinez's mother for coming with such a large group, and she offered Miguel some money to help him paint over the graffiti on his mother's house.

Later that evening, Martinez arrived at Rico's home in a white Honda Accord, which was accompanied by another car. Martinez got out of the front passenger seat of the Honda wearing a red jacket or hoodie and holding a gun that was "big" and larger than a handgun. Martinez said, "What's up fools? You all went to my pad," as he pointed the gun toward Rico and Luiz. Rico

6

ducked behind a car, while Luiz ran away. Martinez fired one shot in their general direction.

E. *The Post-June 5, 2018 Investigation*

On June 6, 2018, a detective obtained a tracking warrant for Martinez's cell phone and officers were able to locate him hiding in a shed near a multi-unit building located in a residential neighborhood. After a standoff, an emergency negotiations team was able to get Martinez to leave the shed without further incident. Inside the approximately 10 foot by 12 foot room, officers found a smashed cellphone in a toilet and a disassembled AR-15 wrapped in a red jacket or sweater. A spent cartridge case for a .223-caliber round officers found at the scene of the June 5, 2018 shooting was determined to have been fired from the AR-15 found in the shed.

DNA from five individuals was found off of the lower receiver and butt stock of the AR-15. DNA from the first contributor made up 65 percent of the sample, while the second contributor made up 25 percent of the sample. DNA from three other contributors made up the final 10 percent. Martinez matched the second contributor's DNA with a likelihood of 1 in 3,830. DNA obtained from two other parts of the firearm that were tested demonstrated limited likelihood of being Martinez's.

F. *Martinez's Defense*

Martinez called a defense investigator, a gang expert, and a psychologist to testify. The gang expert testified that young people in southeast San Diego, where Martinez lived, are known to take credit for crimes they did not commit in order to portray themselves as being more tough than they may be. The defense psychologist testified similarly, and also identified six mental conditions he had diagnosed in Martinez—intermittent explosive disorder, attention deficit hyperactivity disorder,

7

unspecified trauma or stressor related disorder, borderline intellectual functioning, cannabis use disorder, and a conduct disorder of unspecified onset type.

## II.

### *Verdicts and Sentencing*

The People charged Martinez with the April 23, 2018 murder of Fernando (§ 187, subd. (a); count 1) with the allegations he personally and intentionally discharged a firearm and proximately caused a nonaccomplice's death (§ 12022.53, subd. (d)), and personally used a firearm during the murder (§ 1203.06, subd. (a)(1)(A)).[4]

In connection with the June 5, 2018 shooting, Martinez was charged with attempted willful, deliberate and premeditated murder (§§ 187, subd. (a), 664, subd. (a); count 2); two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 3, 4); and one count of unlawful possession of a firearm by a person prohibited from possessing a firearm (§ 29815; count 5). As to count 2, it was also alleged that Martinez personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and as to counts 2, 3, and 4, that he personally used a firearm (§ 12022.5, subd. (a)).[5] The People further alleged Martinez committed counts 1 through 4 for the benefit of, at the

---

[4]     The information also alternatively alleged in connection with count 1 that Martinez personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and/or personally and intentionally used a firearm (*id.*, subd. (b)) in committing the murder. These allegations were ultimately not given to the jury.

[5]     The information alternatively alleged in connection with count 2 that Martinez personally and intentionally used a firearm in committing the attempted murder (§ 12022.53, subd. (b)). This allegation was ultimately not given to the jury.

8

direction of, and in association with a criminal street gang (§ 186.22, subds. (b)(1), (b)(5)).[6]

A jury convicted Martinez of Fernando's murder in the second degree and convicted him as charged on the other four counts. The jury also found true all of the firearm enhancement allegations. On August 12, 2022, the trial court sentenced Martinez to eight years in prison, followed by 15 years to life plus a term of life with the possibility of parole, all to run consecutively. Both Martinez and the People appeal from the judgment.

DISCUSSION

I.

*Martinez's Appeal*

A.   *No Abuse of Discretion in Admitting Opinion Testimony As to the Possible Caliber of the Bullet That Struck Fernando*

Martinez contends the trial court abused its discretion in allowing a district attorney investigator (DAI) to testify about the possible caliber of the bullet involved in Fernando's death. He argues Evidence Code sections 352, 801, and 802 required the court to act as a "gatekeeper" to exclude the DAI's expert opinion because it was speculative, unsupported by the material on which it was based, and lacking in foundation. We disagree.

Before trial, defense counsel moved to exclude any testimony that the firearm used in the April 23, 2018 shooting was the same firearm used in the June 5, 2018 shooting. Alternatively, defense counsel requested a hearing

---

[6]   The gang enhancements were bifurcated for purposes of trial, and after the jury reached its verdicts on the charged counts and non-gang enhancements, the trial court granted the People's motion to dismiss all gang enhancement allegations.

pursuant to Evidence Code sections 402,[7] 801, and 802 and *People v. Kelly* (1076) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (DC Cir. 1923) 293 F. 1013 (*Frye*). The prosecution moved to admit the DAI's testimony. The trial court conducted an evidentiary hearing pursuant to Evidence Code section 402, at which the DAI testified.

The DAI described his background, explaining he was employed as a supervising district attorney investigator, and in his current assignment he was a range master and training sergeant. His training with firearms began in 1986, when he enlisted in the United States Marine Corps. He spent six years as a Marine rifle and pistol instructor, and he shot competitively as part of the Marine rifle and pistol team.

In 1993, the DAI joined law enforcement, attending a police academy for seven months where he received basic firearms training. He served as a police officer for 14 years, after which he worked for five years with the California Department of Justice (CDOJ), working on narcotics and firearms trafficking cases. While there, he received specialized training from CDOJ and the Bureau of Alcohol, Tobacco, and Firearms on the identification, manufacturing, and trafficking of firearms.

In his current supervising position, the DAI organized firearms training for his office, as well as district attorney offices throughout the state. He is responsible for all Peace Officer Standards and Training (POST) certifications for his office's investigators, as well as all the firearms training and defensive tactics training required annually by POST. He described his familiarity and training with the assault rifle platform (i.e., the M16, AR-15,

---

[7] Evidence Code section 402, subdivision (b), provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury."

and M4, all of which fire a .223 caliber round) and "[a]ll manner of pistols from .22 up to .45 caliber." He described being a current SIG Sauer armorer and a POST-certified rifle and pistol instructor.

In addition, the DAI testified about his training on and experience with the effects of different bullets when fired into a variety of objects. When the district attorney's office hires new deputies, the DAI takes the new hires to a shooting range to demonstrate the effects of different caliber bullets on these targets. During these trainings, the DAI and trainees have shot "everything from .38 caliber handguns up to .223, 12-gauge." They fired those different types of ammunition into a wide range of items, including car doors, cinderblocks, drywall, wood framing, and ballistic vest panels, and then compared the results.

The DAI had been given photographs of a bullet hole in a trunk, a bullet hole in a backseat, a trajectory rod going through both bullet holes, and Fernando's body, with a ruler next to each item in the photographs. Based on the photograph of the bullet hole next to the ruler, he opined the bullet hole in the trunk had a diameter of "just about .6 centimeters, which translates roughly to about .22, .23 inches." Over defense counsel's foundational objection, he testified the bullet hole in the trunk was consistent with bullet holes he had investigated in the past, and he opined that the trunk bullet hole was consistent with the firing of a .22- or .223-caliber bullet.

The DAI also described having been trained on the velocity of different types of bullets. Over defense objections based on lack of foundation and speculation, he opined that based on the velocity at which a .223-caliber round travels, the trajectory demonstrated in the photographs was consistent with a .223-caliber bullet. He explained that a .22-caliber round contains less powder, and therefore achieves a slower velocity than a .223-caliber round, so

11

while a .22-caliber round "would probably penetrate the trunk lid," "would go through the trunk," "[m]aybe into the backseat," and "[m]aybe into the body," it is "[n]ot likely that it would exit the other side of the body."

On cross-examination, the DAI acknowledged certain weaknesses in his opinions, including (a) he did not have a scientific degree or background in forensic ballistics; (b) he was familiar with only one of the professional organizations defense counsel asked about, and as to that organization, he was unfamiliar with their guidelines concerning forensic testimony; (c) he did not examine the vehicle or know whether it had a steel or aluminum trunk; (d) he did not use a precision caliper or micrometer to measure the bullet hole; (e) his opinion was limited to describing what caliber the bullet could have been, not identifying its actual caliber; (g) he could not determine whether the bullet hole had been caused by any specific type of .22- or .223 caliber bullet, such as a .22 Hornet, .22 Nosler, .220 Swift, .22-250 Remington, .22-250 Ackley Improved, .221 Fireball, .222 Remington, .223 Remington, .223 WSSM, or .224 Valkyrie; and (h) .22- or .223-caliber ammunition can be fired from a number of firearms, which meant he could not determine precisely what type of firearm had been used..

The trial court heard argument from both sides on the admissibility of the DAI's proffered testimony, engaged in a discussion with the prosecutor and defense counsel, and took the matter under submission. At a later pretrial hearing, the court ruled the DAI's opinion testimony to be admissible. The court explained:

> "So I've read the—I read some of the—I read the cases that were cited by—by [the prosecutor]—and thank you [court reporter] for giving me all that information. I appreciate it. And so now—so I guess I'm looking at it in this way. This is not really—this is not really a *Kelly-Frye* issue, this is

12

not a new technology like DNA was back when that was—
we went through the *Kelly-Frye* process.

"This is more of a person who has unique experience that
most likely people do not have because of his—his
involvement in military and his involvement with guns and
the range master, et cetera. And so—and the fact that he's
actually shot .223s and .22s into the metal and is familiar
with what the holes look like. It's not . . . scientific. I
would call it more like a learned opinion.

"And so—but, certainly, all of the things that he cross-
examined him on or things that are—that you can take him
on about. But I think that—I think that his, that—and you
can certainly challenge that. But I think his opinions are
relevant. I think his opinions are helpful to the jury. I
think that the fact that—well, again, I think it's sort of like
a police officer saying, you know, I estimated the speed to
be X, and it's not precise, but that's kind of what this is."

At a subsequent pretrial hearing, defense counsel requested the
evidentiary hearing on the DAI's expert testimony be reopened. Counsel
argued the DAI, in emails with another investigator, admitted he is not a
ballistics expert and there could be confirmation bias because he had been
asked if the bullet holes were created by a .223-caliber round. The trial court
denied the request, stating: "I still stand by my earlier ruling and think that,
again, this is a learned opinion. [¶] . . . [¶] He's not a ballistic expert, I agree,
but is it absolutely necessary that he be a ballistic expert to offer that
opinion? And I don't think he needs to be. I think based upon his training
and experience, he can offer an opinion and you certainly have a lot of
ammunition, no pun intended, to dispute it."

At trial, a criminalist testified the bullet fragments extracted from
Fernando's body were too damaged to support any conclusions about the type
of bullet that hit him. The following colloquy transpired between the
prosecutor and the criminalist:

13

"Q:      Now, this type of round that fires from a 5.56 or .223, do they—do they fragment in this way?

"A:      They definitely can fragment. Part of their design is to break apart when hitting a body.  So they can fragment.

"Q:      Okay. Do you see in the course of your experience a .223 round or a 5.56 type round fragment in this manner?

"A:      I have seen them fragment like that.

"Q:      So would you say this is unusual?

"A:      No."

Defense counsel asked in cross-examination:

"Q:      Now, I want to ask you just a couple of questions about caliber determination.  AFTE [i.e., the Association of Firearms and Tool Mark Examiners,] doesn't scientifically support examining a photograph or a bullet hole to determine caliber . . . ; is that fair to say?

"A:      That's not something I've ever seen . . . done through AFTE.

"Q:      OSAC [i.e., the Organization of Scientific Area Committees,] also doesn't support that . . . , correct?

"A:      I will say that there are plenty of articles published that I have never read, but that's not anything that I've seen through any of them.

"Q:      The best practice for caliber determination is through the process that you took in the crime lab using the equipment that you had available, correct?

"A:      For us, for forensic scientists, when I talk about caliber determination, I'm talking about getting the actual bullet itself and doing measurements, doing—weighing and

14

measuring how—the diameter base looking at the structure. That's what we consider a bullet caliber determination.

"[¶] . . . [¶]

"Q:      On direct examination a moment ago, [the prosecutor] asked you about calibers and fragments and .223, and 5.56 ammunition fragmenting. Other bullets also fragment upon impact, correct?

"A:      Yes."

On redirect, the criminalist explained she remained comfortable testifying that she has observed .223-caliber rounds fragment similar to the round that killed Fernando, despite defense counsel's questions about the forensic science organizations:

> "There's kind of two parts to—let me make sure I say this carefully. There's kind of two parts to a forensic analysis. If you're asking me based on my generalized—and AFTE, part of their bylaws just address this and part of their code of ethics. [¶] If you're just saying to me, in your experience you've seen hundreds if not thousands of these, is this something that you've seen? Yes, I can say that without doing scientific testing because it is my—I can say that in my experience, this is something that I've seen.
>
> "But if you're asking me for a scientific conclusion, like, has this bullet been fired from this gun, now you're asking for a very specific thing and I need to go through all of that testing and conclusions. I need to make sure I'm following an approved scientific method, because I am giving you a forensic answer as opposed to what is my experience as someone who has looked at a lot of these things. So—I am answering it from a different perspective if that makes sense."

15

During the prosecutor's direct examination of the DAI, he acknowledged that, unlike the criminalist who testified, he is not a ballistics criminalist analyst, scientist, member of any sort of ballistics organization, or member of any organization that deals with the scientific aspects of firearms. Consistent with his testimony at the evidentiary hearing, the DAI testified an AR-15 is a semiautomatic rifle that fires a .223- or 5.56-caliber cartridge. He explained a ".223 would fit through [the bullet hole in the trunk], a .22 would fit through it, and anything smaller than those would fit through it," but a .308-, .38-, .40-, or .45-caliber bullet would not fit through. The court overruled defense counsel's foundation objection to the DAI's opinions about what caliber round would fit through the hole. Over the same objections, the DAI opined, based on his training and experience and their difference in velocity, that a .223-caliber round could travel through the trunk, the rear seat, and Fernando's body, but it was his belief a .22-caliber round could not.

As he did during the evidentiary hearing, on cross-examination at trial the DAI conceded many points about the limitations of his opinions. And, on redirect, the prosecutor asked, "Are you making an opinion today that you can definitely conclude that a .223 round caused that hole?" He responded, "No, sir."

Relevant to the DAI's testimony, the trial court instructed the jury as follows:

> "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.
>
> "[¶] . . . [¶]

16

"In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure.

"[¶] . . . [¶]

"The prosecution failed to disclose the following items within the legal time period:

"[¶] . . . [¶]

"(4) The report, statement, and opinion of [the DAI]."

The court further instructed jurors as follows:

"Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.

"[¶] . . . [¶]

"In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.

"You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

17

"If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications."

In closing argument, defense counsel urged the jury to not credit the DAI's testimony:

"[One witness] is a ballistics expert, a criminalist for over ten years. She was a supervisor at the SDPD Crime Lab. She's someone who is a member of [AFTE], an organization that has a code of ethics that requires the scientific method be followed and requires that you only follow approved methods of forensic evidence. And that's what she's done her whole career. And that's what she did in this case. She reviewed the evidence. She reviewed the bullet fragment from April 23rd, 2018, and she could not make a caliber determination, meaning she couldn't say it was a .223, which is so crucial to the prosecution's case.

"She could not say it was a .223 caliber bullet because it is not supported by the evidence. She couldn't say that bullet was fired from the AR-15 because it is not supported by the evidence. She couldn't say that the gun recovered on June 6th 2018 was the same gun used on April 23rd, 2018 because it is not supported by the evidence, by the science.

"And enter [the DAI], who, yes, has experience as a firearm's expert but who himself testified, I am not a ballistics expert and in this case, what did he do? It wasn't a reconstruction. He admitted that much. Because to truly help determine the caliber of a bullet, there are certain factors that you would need potentially just by looking at the bullet. The angle, the distance, biomechanical issues. The type of surface it hit, what that surface was made up of. None of that was available nor was it attempted to be recreated.

"So what we have here is someone who comes in after being asked by the prosecution team can you look at this bullet

18

hole and tell me if this is a .223 caliber bullet that caused it. That's problematic because confirmation bias, contextual bias, cognitive bias will lead you to the answer that you're suggested in the question. But what we know is that [AFTE] themselves have conducted studies on this.

"And I asked [the DAI] if he was aware of those things, specifically a study where a .25 caliber bullet which is bigger than a .22 created a smaller hole than the .22 when fired into an object because that's what cases like this demand. Honesty in evidence. Scientific method. Forensics that are backed up by actual procedure and practice and repetition.

"This was the first and only time in his 30 year career that [the DAI] was asked to provide an opinion about this and never did provide an opinion about this because during his 30 years law enforcement career, whenever there was a firearm investigation, a shooting, a homicide, it was submitted to the crime lab for caliber determination and ballistics because the crime lab is the department that makes those findings based on science and not speculation of a photograph taken four years ago."

The prosecutor acknowledged in rebuttal the following:

"There was a lot mentioned . . . regarding [the DAI's] investigation. [The DAI] is not a ballistics expert. He never represented to be one. He's not a scientist. He's not a part of organizations that ballistics individuals like [the criminalist] would be a part of. But what he did was provide you a learned opinion based on his experience as a man that shoots a whole lot of guns, including AR-15s. The man trains people to shoot AR-15s.

"He has measured the holes left by AR-15s, and he's not coming before you making an ultimate conclusion that [it] was a[n] AR-15 [round]. We know that that round split into several small pieces. [The criminalist] was unable to make a determination. We understand that. [The DAI] is simply telling you that a .223 round would fit through that hole consistent with a .223 round. And more so it is

19

consistent with the velocity to travel through that trunk, through the chair, into the body of the deceased and out the front. That is the testimony that [the DAI] provided to you."

"[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 (*Sargon*).) However, "courts must also be cautious in excluding expert testimony." (*Id.* at p. 772.)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon, supra*, 55 Cal.4th at p. 772.) Such an opinion may be based on "professional studies or personal experience." (*Ibid.*)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426 [cleaned up].) "To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason. A merely debatable ruling cannot be deemed an abuse of discretion.'" (*People v. Johnson* (2022) 12 Cal.5th 544, 605 (*Johnson*) [cleaned up].)

20

Here, the trial court reasonably decided to allow the DAI's testimony, despite the fact he is not a ballistics expert. The DAI possessed many years of extensive training and experience with firearms, including the effects of different caliber ammunition on a variety of objects, through his time as a Marine, a competitive shooter, a peace officer, a range master, an armorer, and a firearms instructor. In training new deputy district attorneys on the effects of various firearms, the DAI shot a variety of firearms, ranging from .38-caliber handguns to .223-caliber rifles, into different materials, such as car doors, car fenders, steel plates, Kevlar vests, cinderblocks, wood framing, and drywall. He and his trainees would measure the bullet holes different ammunition created, as well as observe whether the ammunition was able to penetrate the target material. The DAI based his opinions on his wide-ranging training and experience with firearms and ammunition, and the trial court reasonably concluded that this experience and training formed the basis of expertise that could assist the jury in considering the evidence in this case.

The Supreme Court discussed similar expert testimony in *People v. Ayala* (2000) 24 Cal.4th 243, 280 (*Ayala*), where an investigator taped two bullets of known caliber to a victim's body. The victim was X-rayed to compare the sample bullets with the bullet inside of the victim to try to determine its caliber. (*Ibid.*) Over defense counsel's objection, a diagnostic radiologist who was certified as an expert testified, " '[T]he deformed projectile within the patient most likely represents . . . the same caliber as . . . the [taped] projectile . . . just to the left . . . of the projectile within the patient.' " (*Ibid.*)

The defendant in *Ayala* challenged the admission of this expert opinion testimony, arguing it "amounted to expert testimony in ballistics, a topic in

21

which [the radiologist] was not an expert." (*Ayala, supra*, 24 Cal.4th at p. 281.) The Supreme Court rejected this contention, explaining: "[The radiologist] acknowledged that he was not a ballistics expert, and declined to testify about the bullets' caliber. He did testify that both bullets appeared to be the same 'caliber,' by which he could have meant the same size—defendant did not object or ask the radiologist to clarify his meaning in further examination. As a radiologist, [he] could testify that the bullets were located so that their relative size would not be distorted in the X-ray photographs." (*Ibid*.) The Court also rejected the idea that the radiologist had "conducted a scientific experiment that did not satisfy foundational relevance requirements." (*Id*. at p. 282.) The Court reasoned: "The X-ray procedure was not an experiment performed in order to duplicate the conditions of the crime—as stated, it was not an experiment of any kind. Rather, it was simply a procedure that gave the radiologist an opportunity to describe a physical effect of the shooting that the jury could not discern without expert help." (*Ibid*.)

Like the radiologist in *Ayala*, the DAI possessed expertise that could help the jury. Again, the DAI based his opinions on his particular expertise, which was well-documented. And, like the radiologist in *Ayala* who "declined to testify about the bullets' caliber" (*Ayala, supra*, 24 Cal.4th at p. 281), the DAI specifically testified he was not concluding "that a .223 round caused [the] hole" in the trunk. Instead, he testified, based on his years of experience of shooting different caliber bullets into various materials, that it was his opinion that a .223-caliber round or "anything smaller" would fit through the hole and that the degree of penetration was consistent with the bullet having been a .223-caliber round, not a .22-caliber round.

22

Much of Martinez's argument regarding the admission of the DAI's testimony goes to the possible weight to which it was entitled, not to its admissibility. For example, Martinez takes issue with certain failings in the DAI's examination of the evidence, arguing among other things that he "did not examine the trajectory rod's diameter" and the "the millimeter lines [on the photographed ruler used for measurements] did not align with the edges of the hole." Such challenges do not undermine the DAI's specialized knowledge, training, and experience, nor do they demonstrate his opinions were speculative or based on improper material. Instead, these are issues that were potential subjects for cross-examination and go to the persuasiveness of the DAI's testimony; they do not form a basis for rejecting the testimony as inadmissible. (See *People v. Morales* (2020) 10 Cal.5th 76, 97 [when a witness has established having sufficient knowledge of a subject to entitle his option to be presented to the jury, the degree of his knowledge is a question of weight more than admissibility]; *People v. Cook* (2007) 40 Cal.4th 1334, 1346 ["defendant's observations that [a criminalist] did not document all his work, took some inaccurate notes, did not conduct 'blind' testing, deviated from the lab protocol in some respects, and failed to respond to a coworker's doubts about the accuracy of a test of blood on a carpet are all matters going to weight, not admissibility"]; *People v. Morganti* (1996) 43 Cal.App.4th 643, 664, fn. 12 ["the quality of the testing performed in a particular case is an issue relevant to weight not admissibility"].) We conclude the trial court did not abuse its discretion in admitting the DAI's expert testimony at issue.

Given our conclusion the trial court properly exercised its discretion to admit the DAI's expert opinion under Evidence Code sections 801 and 802, Martinez's claim the ruling violated his federal constitutional right to due

23

process necessarily fails. "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957; accord *People v. Abilez* (2007) 41 Cal.4th 472, 503.)

B.    *Excluding One of Martinez's Hearsay Statements in Which He Denied Having Shot Fernando Was Harmless Error*

Martinez argues the trial court erred by excluding evidence of his out-of-court statement in which he denied having shot Fernando that he offered for impeachment purposes. Although we agree the court erred, we conclude the error was not prejudicial.

At trial, defense counsel sought to admit evidence of a Facebook conversation between an individual named Jonathan F. and Martinez in which Martinez denied having shot Fernando. In the written conversation, Jonathan and Martinez traded insults, and then Jonathan asked Martinez if he was "the one who shot my lil cousin nano . . . .??" Martinez replied, "Nah why." Jonathan pressed Martinez at least two more times about his claims, and those of his tagging crew, regarding Fernando's death, and Martinez denied his crew was involved, saying "Nah not us . . . ," and he repeated his denial that he was the one who shot Fernando.

The prosecutor objected to the admission of this conversation as inadmissible hearsay, arguing its admission would violate Evidence Code section 1220—which provides an exception to the hearsay rule for admissions of a party opponent—noting that "[i]t is a statement of the defendant not being offered by a party opponent." Defense counsel argued the conversation was nevertheless admissible under the business record exception, or it was admissible not for its truth, but to impeach Martinez's other out-of-court statements of guilt before the jury. The court excluded evidence of the

24

Facebook conversation, concluding the statements were inadmissible hearsay, for any purpose.

On appeal, the People concede the Facebook conversation was admissible for impeachment, but argue the trial court's error was harmless because the court had admitted at least one other of Martinez's denials, as well as other impeachment evidence. We accept the People concession as proper.

Evidence Code section 1202 provides in pertinent part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." Thus, "when a hearsay statement by a declarant who is not a witness is admitted into evidence by the prosecution, an inconsistent hearsay statement by the same person offered by the defense is admissible to attack the declarant's credibility." (*People v. Corella* (2004) 122 Cal.App.4th 461, 470.) "The purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination." (*Ibid*.)

The rule set out in Evidence Code section 1202 applies to criminal defendants. (See *People v. Baldwin* (2010) 189 Cal.App.4th 991(*Baldwin*).) When the People introduce a defendant's hearsay statement admitting guilt, a defendant's hearsay statement denying guilt is admissible as impeachment evidence for the purpose of calling into question the admission of guilt. (*Id.*

at pp. 1002–1007.)  Here the trial court failed to appreciate that Evidence Code section 1202 expressly allows a defendant to offer his hearsay statements denying guilt for the limited purpose of impeaching his out-of-court statements conceding guilt.

The error, however, was harmless.  Here, the parties disagree as to the applicable standard on prejudice.  Martinez, contending that this error violated his constitutional rights to present evidence and due process, argues the trial court's error must be analyzed for prejudice under *Chapman v. State of California* (1967) 386 U.S. 18 (*Chapman*).  The People assert prejudice should be determined under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  We agree with the People.

Where the trial court rejects only some evidence concerning the defense, the proper standard to review for prejudice is that set forth in *Watson*, *supra*, 46 Cal.2d at page 836, not the stricter standard reserved for errors of constitutional dimension as set out in *Chapman*, *supra*, 386 U.S. 18. (*People v. Boyette* (2002) 29 Cal.4th 381, 428; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 ["Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson*."].)  Here, the court did not reject *all* evidence related to Martinez's attempt to undermine his out-of-court statements inculpating him in Fernando's shooting.  Rather, the court permitted Martinez to challenge those statements as being mere puffery through a variety of other evidence, including at least one other out-of-court statement in which he denied involvement in the shooting, as well as through the testimony of an investigator who conceded Martinez had also denied committing the homicide in other conversations.

26

Applying the *Watson* prejudice standard, we conclude it is not reasonably probable the jury would have reached a result more favorable to Martinez if his Facebook out-of-court denial had been admitted for impeachment purposes. First, as previously mentioned, the court allowed the defense to question witnesses about and even admit in evidence other statements by Martinez in which he denied having participated in Fernando's killing. For example, defense counsel succeeded in getting a prosecution investigator to testify that Martinez denied committing the homicide to an individual named Angel, who referred to Fernando as "my brother." And because the prosecutor never objected to testimony of Martinez's out-of-court statements to Angel, this evidence was admitted for all purposes, including as evidence of the truth of Martinez's denial. Unlike this evidence, however, the out-of-court denial Martinez complains should have been admitted would have only been admissible for impeachment purposes.

Beyond this, the trial court permitted defense counsel to make use of a variety of other evidence to undermine Martinez's out-of-court admissions. Defense counsel pointed out multiple instances from Martinez's Facebook messages in which he made false claims and engaged in puffery in an attempt to make himself look more "tough." For example, defense counsel highlighted that although Martinez claimed to be "clicked up with Logan" (a criminal street gang), there was no evidence to support this claim. Similarly, Martinez made claims elsewhere about "beefing it with Logan" and Sherman, another criminal street gang, and asserted police had "raided" his home. But there was no evidence to support these claims either. The defense gang expert, who was a former gang member, testified it is common for young people in Martinez's neighborhood to exaggerate and even make false claims in order to portray themselves as tough. To demonstrate, the expert

27

recounted how a different gang member had taken credit for a murder the expert had actually committed. Defense counsel also elicited testimony from a psychologist to the effect that it is common for youth, especially those who have suffered trauma, to present themselves as tougher than they really are. The psychologist also explained that young people sometimes claim credit for crimes they did not commit to further this perception. The defense presented and elicited plenty of evidence calling into question the veracity of Martinez's out-of-court admissions of guilt, such that additional possible impeachment evidence would have been cumulative.

Most important to our analysis, however, is that this cumulative impeachment evidence was minimal compared to the strong evidence demonstrating Martinez's guilt in Fernando's killing. (See *Baldwin, supra*, 189 Cal.App.4th at p. 1006 [error under Evid. Code, § 1202 was harmless in light of overwhelming evidence of guilt].) Martinez was at the crime scene and had acted violently toward the victim and his friends. In recorded messages, Martinez repeatedly implicated himself in the shooting through credible admissions. He acknowledged "smok[ing]" Fernando, told others that he was on the run for murder, and he made additional threats to "smoke" others. Even accounting for the instances of Martinez's puffery, Martinez's repeated admissions of guilt, which were corroborated by other evidence, were overwhelming. The jury heard Martinez had obtained an AR-15 approximately a year before Fernando's killing, and that he watched videos on how to use that firearm in the days before the shooting. There was evidence, including eyewitness testimony, that Fernando had been shot by a "big gun," approximately two and a half feet long, like an AR-15. Martinez's postshooting conduct further demonstrated consciousness of guilt. He searched for and viewed news articles about the shooting, and went into

hiding because someone "snitched [him] out." He used an AR-15 to commit another shooting on June 5, 2018, merely a month and a half later. Later, Martinez hid the rifle, resisted arrest, and destroyed a cell phone that he had in the room where he was hiding.

In sum, the totality of the evidence persuades us it is not reasonably probable the jury would have reached a more favorable result had the trial court permitted the defense to offer an additional hearsay denial by Martinez for the purpose of impeaching his repeated admissions of guilt.

C.    *No Abuse of Discretion in Exclusion of Martinez's Statement That His Father Was So Angry That "His Vein Popped"*

Similar to the previous argument, Martinez contends the trial court abused its discretion in excluding a March 27, 2017 Facebook conversation between him and another individual in which Martinez seemed to falsely claim he had been the cause of his own father's death. Defense counsel sought to admit these statements for the nonhearsay purpose of showing Martinez had engaged in "puffery," in order to impeach other incriminating statements as also being puffery. The Facebook conversation went as follows:

> "[J.M.:]  I was scared of you lowkey[ ]
>
> "[Martinez:]  Why
>
> "[J.M.:]  Cuz you told me that your dad died because of you? That his vein popped because he was so mad at you and he screamed then his vein popped
>
> "[Martinez:]  I forgot I told u that
>
> "[J.M.:]  Yeaah lmfao
>
> "[Martinez:]  What's funny
>
> "[J.M.:]  Wait that's not true right

29

"[Martinez:]  It is

"[J.M.:]  Damn I'm sorry"[8]

The trial court was not persuaded, stating, "[W]e're spending way too much time on all this anyway and . . . I think that there's plenty of examples in what is coming in of puffery."  The court noted there would have to be evidence presented to demonstrate Martinez's claims in the statement were, in fact, puffery, as no one knew whether his father had died, and, if so, how he died.  When defense counsel responded that Martinez did not even know his father, the court noted even this foundational fact would have to be proven, demonstrating that "we're going to go off on some tangent to try to show that he was puffing."  The court ruled the particular conversation was cumulative and required an undue consumption of time in comparison to its probative value and excluded the proffered evidence pursuant to Evidence Code section 352.  We see no error.

A trial court has discretion to exclude otherwise admissible evidence if its probative value is substantially outweighed by the probability that its admission will necessitate an undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352.)  Under Evidence Code section 352, " 'a trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming.' "  (*Johnson, supra*, 12 Cal.5th at p. 605 [cleaned up].)  We review the admission and exclusion of

---

[8]     In the exhibit in which these messages were documented, the messages appear in reverse order, so that the last message appears at the top of the page, while the first message appears on a second page.  For ease of comprehension, we reflect the messages here in the order in which they were sent, rather than the order in which they appear in the exhibit.

30

evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004 [under abuse of discretion standard, " 'trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice' "].)

Here, the trial court reasonably found that the particular statement was merely cumulative of other evidence of Martinez's exaggeration of, if not full fabrication of, his involvement in various other conduct. The court also found the defense would need extrinsic evidence to demonstrate the falsity of Martinez's claims regarding his father's death to establish it was puffery. (See Evid. Code, § 403.) A "trial court has discretion to exclude impeachment evidence . . . if it is collateral, cumulative, confusing, or misleading." (*People v. Price* (1991) 1 Cal.4th 324, 412.) We cannot say the trial court's exclusion of this evidence was arbitrary, capricious, or patently absurd. We conclude the court was well within its broad discretion to determine the probative value of the proffered evidence was substantially outweighed by the probability that its admission would require an undue consumption of time.

D.   *Assuming Error in the Trial Court's Admission of A Gang Expert's Testimony He Had Never Known A Gang Member to Falsely Take Credit for Committing a Murder, Martinez Has Failed to Demonstrate Prejudice*

Martinez next contends the trial court erred in allowing testimony from the prosecution's gang expert that he had never known a gang member to falsely take credit for committing a murder. After the prosecutor questioned the gang expert about how Martinez's Facebook messages included disrespectful and mocking language, the following testimony was elicited:

31

"Q.    In your experience do people take claim for a murder they didn't commit?

"A.    No.

"Q.    Why?

"[Defense counsel]:   Objection.  Lacks foundation

"The Court:    Okay.  Lay the foundation.

"Q.    In your experience in investigating gang related crimes, looking at social media and discussing gang related events with gang members, have you experienced anyone that admits to a murder they didn't commit?

"A.    No, I have not.

"Q.    Why is that?

"[Defense counsel]:   Objection.  Lacks foundation

"The Court:    Overruled.

"A.    There would be consequences, basically, twofold.  Consequences legally.  You're admitting to a crime that you didn't commit but that admission could be used against you criminally.  But then there is the bigger thing, which would be against you on the street.

"If you're —everything about - - everything we talked about with respect and earning their respect through violent acts or through committing crimes or doing whatever you're doing to earn your respect, well, killing somebody is the ultimate violent crime.  So that's the biggest way to earn fear among your associates and your rivals.

"So if you're taking credit for it, you're trying to put yourself up there, but the person who did the murder, if you didn't do it, they know you're lying.  That[ ] you're full of it  They know that you didn't do that.  So then you're

32

obviously someone who lies. You're going to be disrespected. They're not going to respect you because you're claiming thing you didn't do.

"Nobody - - they respect - - well, part of respect is telling the truth, but they're going to - - the person who did it - - they're the ones who earned that respect from doing that. So they're going to know. Their companions are going to know, and you're going to face the repercussions of trying to take credit for what they didn't [sic] do.

"Kind of like when we talked about taking Southeast out of your name because you didn't earn it. It's along the same lines. So you would expect that the person who claimed to do something they didn't do would get disciplined by the people who actually did it for trying to take their credit."

Martinez makes two related claims in connection with this evidence. First, he asserts this testimony would have only been relevant if the prosecution had proved certain preliminary facts—namely that Martinez was a gang member, rather than a tagging crew member, or that being a gang member was so similar to a tagging crew member that this testimony would have a tendency in reason to prove a tagging crew member also would not lie about committing a murder. Because neither of these preliminary facts had been demonstrated, Martinez argues, the gang expert's testimony was not relevant to demonstrating Martinez's admissions should be believed and should have been excluded on relevance grounds.

We conclude Martinez has forfeited his contention this testimony should have been excluded on relevance grounds. As the record demonstrates, defense counsel did not object to the testimony as lacking relevance. The lack of a specific objection challenging the evidence on relevance grounds results in forfeiture of argument on appeal. (See, e.g., *People v. Dykes* (2009) 46 Cal.4th 731, 756 (*Dykes*) ["numerous decisions by

33

this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)

Second, Martinez argues the gang expert's testimony as to the "reasons why a gang member would not lie about committing a murder" should have been excluded because the testimony was "speculative." We also conclude the lack of a specific objection challenging the evidence as speculative results in forfeiture of the argument on appeal. (*Dykes, supra*, 46 Cal.4th at p. 756.)

But even if we were to overlook the forfeiture of these arguments, we conclude any error was harmless. Like the erroneous exclusion of evidence, the erroneous *admission* of evidence is generally reviewed for prejudice under the standard set out in *Watson, supra*, 46 Cal.2d 818, which, again, requires reversal only if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.) Martinez argues, however, that the admission of this evidence not only constituted state law error but violated his federal constitutional right to due process. The admission of evidence in violation of state law will only be found to also violate due process if the error rendered the defendant's trial fundamentally unfair. (*People v. Merriman* (2014) 60 Cal.4th 1, 70.) Here we cannot conclude a presumed error of admitting the gang expert's opinion about the lack of false confessions of murder amongst gang members rendered Martinez's trial fundamentally unfair.

As a result, we apply the *Watson* prejudice standard and conclude it is not reasonably probable a result more favorable to Martinez would have been reached even if the court had excluded the gang expert's testimony regarding his view as to why he had not encountered a situation in which a gang

member falsely took responsibility for a murder he did not commit. First, this evidence did not go uncontradicted. In fact, the defense presented its own gang expert—a former gang member—who testified it is common for youth in Martinez's neighborhood to make any variety of false claims to portray themselves as "tough." He then provided a specific instance where his fellow gang member took credit for a murder that the expert had committed when he was 17 years old. Martinez's attorney also elicited similar testimony from a psychologist, who described how it is common for kids, especially those who have suffered trauma, to present themselves as tougher than they really are. Sometimes these kids take credit for crimes they did not commit to further the goal of appearing tougher.

Beyond this, there was plenty of evidence demonstrating Martinez had, in fact, engaged in puffery repeatedly. Yet, the jury was disinclined to believe that Martinez's multiple claims of responsibility for Fernando's death were also instances of puffery, likely because Martinez's admissions were corroborated by the other evidence presented at trial. Such evidence included Martinez's possession of a large firearm, his viewing of videos on how to use it just before the shooting, and his post-shooting conduct—including searching for and viewing articles on Fernando's death and telling someone he had gone into hiding and sharing video evidence of the interior of his hideout. In addition, when he was ultimately found hiding in a shed after the June 5, 2018 shooting, Martinez had destroyed his cell phone and officers found a semiautomatic firearm in the shed. In light of all the evidence and the many times Martinez admitted his role in Fernando's shooting, there is no reasonable likelihood that the jury would have reached a different conclusion about his guilt in the absence of the prosecution's gang expert's opinion about why gang members are unlikely to lie about being responsible

35

for murders they did not commit.  That testimony was simply "unimportant in relation to everything else the jury considered."  (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

E.      *No Cumulative Error*

Martinez contends the cumulative effect of the errors he has identified necessitates reversal of his convictions.  Under the cumulative error doctrine, "[a] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  As we have concluded, none of the errors about which Martinez complains—whether real or presumed—supports reversal when considered individually.  We conclude the same is true even when the asserted errors are considered in the aggregate.

The two evidentiary errors Martinez has identified, one of which is an error we have presumed for the sake of argument, do not warrant reversal when considered in the context of the entire trial.  The effect of the exclusion of evidence that was merely cumulative of abundant evidence going to Martinez's credibility was negligible.  And the admission of the gang expert's opinion as to why he had not witnessed a gang member falsely claim responsibility for murder also went to the veracity of Martinez's claims of responsibility, a topic on which much evidence was presented by both sides.  Indeed, the gang expert's testimony was countered by other expert testimony as well as abundant evidence of Martinez's puffery.  In sum, the cumulative impact of these evidentiary rulings did not deprive Martinez of a fair trial or due process of law.  (See *People v. Thomas* (2011) 51 Cal.4th 449, 489.)

E.	*On Remand, the Trial Court Must Conduct An Ability-to-Pay Hearing Before Imposition of Fines and Assessments*

At sentencing, the trial court stated its intention to impose a $10,000 restitution fine, a $200 court security fee (§ 1465.8), and a $150 criminal conviction assessment (Gov. Code, § 70373), among other fines and fees. Martinez requested a hearing on his ability to pay the various assessments and fines the court intended to impose, but the court declined to do so. Relying on *People v Duenas* (2019) 30 Cal.App.5th 1157, Martinez asserts the court's imposition of these court facilities and court operations assessments and the $10,000 restitution fine without conducting an ability-to-pay hearing violated his rights under both the state and federal constitutions.

The question whether it is constitutionally permissible to impose the challenged assessments and restitution fine without first determining a defendant's ability to pay is currently pending before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, 94, review granted November 13, 2019, S257844 (*Kopp*). The People nevertheless concede that Martinez, who was 16 years old at the time he committed the offenses, was "entitled to an ability-to-pay hearing" and that such a hearing should have taken place. As we explain next, because we are remanding for full resentencing on the basis of one of the People's asserted sentencing errors, on remand the trial court must conduct an ability-to-pay hearing before imposing any fines and assessments.

## II.

### *The People's Appeal*

The People assert the trial court committed three sentencing errors that require us to vacate the sentence and remand for resentencing: (1) the trial court failed to appreciate the full scope of its discretion under section

1385, subdivision (c), to impose an enhancement under section 12022.53, subdivision (d), as to the murder conviction in count 1; (2) it failed to either pronounce sentence on or strike the jury's true finding on the section 12022.53, subdivision (c), enhancement pursuant to section 1385 as to count 2; and (3) it erroneously stayed punishment for counts 3 and 4 under section 654, rather than imposing and staying execution of sentences on these counts. We agree with the People as to their first claim of sentencing error and because we are vacating Martinez's sentence and remanding for full resentencing, we do not need to address the People's second and third claims.

The People contend the trial court erroneously struck a 25-years-to-life enhancement based on the jury's finding that Martinez personally discharged a firearm causing death (§ 12022.53, subd. (d)). They argue that the court mistakenly believed it was mandated to dismiss the section 12022.53, subdivision (d), enhancement under recent amendments to section 1385 enacted by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1). Martinez argues the court understood the scope of its discretion and exercised that discretion when it dismissed the enhancement. We agree with the People and conclude the court's error requires vacatur of the sentence.

At the August 12, 2022 sentencing hearing, the trial court considered the newly enacted provisions of section 1385, subdivision (c). The trial court and the prosecutor engaged in the following discussion on the topic:

> "[The Court:] So the statute that we're all talking about is — I mean, to me, I think the way I read the statute is that I don't have a choice. When I'm talking about the gun allegation, I don't have a choice but to reduce it.
>
> "And so I'm going to impose a sentence of 15 years to life, because that is the statutory sentence on second degree murder. And since my reading of the statute—I understand that there is a letter that said something a

38

little different, but until that statute changes, I think I'm bound by what the statute says to me and how I interpret it.

"And so I'm going to strike the punishment of the [section 12022].53 and—but impose 3 years consecutive to the 15 years to life on Count 1, because I think that the statute gives me the authority to still impose a punishment, but not the full [section 12022].53 punishment. Because then it makes the—that enhancement—it makes the sentence longer than 20 years.

"And so on Count 1, it will be 15 years to life plus 3, which is the low term on [the section 12022].5.

"[The prosecutor]: Your Honor, I hate to interrupt you. I do believe the Court has the authority, if this is the avenue the Court is taking, to impose—or to consider imposing not only the [section 12022].5, but also the [section 12022].53(b) and the [section 12022].53(c) as the lesser enhancements.

"So the People would ask this Court to consider imposing the [section 12022].53(c), which is a 20-year enhancement.

"The Court: But it still makes the sentence longer than 20 years. The total sentence is longer than 20 years because of the enhancement. That is the issue.

"[¶] . . . [¶]

"[The prosecutor]: I think the ambiguity of the statute in whole is up for debate.

"The Court: We're going to find out about that. We're going to find out about it in this case, I'm sure.

"[The prosecutor]: My record is that the Court has the obligation to impose the [section 12022].53(d). I made my record on that. But I'm also supplementing that saying I believe, too, even in the spirit of [section] 1385(c) and the language that was enacted this year, that it also gives the

39

Court the ability to impose the (c), (b), and [section 12022].5(a) because it would fit within the 20 years.

"The Court: Okay. And my reading of the statute is that total term with the crime and the enhancement is more than 20 years, then I can't—it adds up to more than 20 years, then I can't."

" 'For all criminal sentencings after January 1, 2022, our Legislature in Senate Bill No. 81 (2021–2022 Reg. Sess.) has provided direction on how trial courts are to exercise their discretion in deciding whether to dismiss sentencing enhancements.' " (*People v. Corbi* (2024) 106 Cal.App.5th 25, 45, quoting *People v. Walker* (2022) 86 Cal.App.5th 386, 391, affd. (2024) 16 Cal.5th 1024.) "Specifically, section 1385, subdivision (c)(1) now provides that 'the court shall dismiss an enhancement if it is in the furtherance of justice to do so,' and subdivision (c)(2) states that '[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence' of nine listed 'mitigating circumstances,' any 'one or more' of which 'weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' " (*People v. Mazur* (2023) 97 Cal.App.5th 438, 443–444 (*Mazur*).)

The nine listed "mitigating circumstances" include factors like mental illness, prior victimization, childhood trauma, and the use of a prior conviction over five years old. (§ 1385, subd. (c)(2)(A)–(I).) Two of the mitigating circumstances include "shall be dismissed" language: section 1385, subdivision (c)(2)(B), not implicated here, applies where "[m]ultiple enhancements are alleged in a single case," and subdivision (c)(2)(C), which the trial court appears to have relied on, refers to situations in which "[t]he application of an enhancement could result in a sentence of over 20 years."

Both subdivisions provide that if the relevant circumstance is present, an enhancement "shall be dismissed." (§ 1385, subd. (c)(2)(B) & (C).)

Since Martinez's sentencing, reviewing courts have rejected the argument the "shall be dismissed" language of subdivisions (c)(2)(B) and (c)(2)(C) of section 1385 *requires* dismissal anytime the relevant circumstance is present, concluding instead that dismissal is not mandatory under these provisions. (See *Mazur, supra*, 97 Cal.App.5th at p. 446; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290, 297 (*Mendoza*); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21 (*Lipscomb*).) "[T]he statutory phrase 'shall be dismissed' in section 1385, subdivisions (c)(2)(B) and (c)(2)(C) cannot be read in isolation." (*Mazur,* at p. 445.) Rather, when read in context, section 1385 expressly permits imposition of enhancements that would lead a total sentence of over 20 years or where multiple enhancements are alleged when a trial court "finds that dismissal of the enhancement *would endanger public safety*" (§ 1385, subd. (c)(2), italics added). (See, e.g., *Mazur,* at p. 445; *Mendoza*, at pp. 290–293; *Lipscomb,* at pp. 15–21.)

But the statute also permits the imposition of multiple enhancements or an enhancement that would result in a sentence of more than 20 years, even where there is no finding that dismissal would endanger the public. When "[c]onstrued as a whole, the statute makes clear that all the mitigating circumstances listed in subdivision (c)(2) merely guide the court's discretion in determining whether a dismissal is in furtherance of justice." (*Mazur, supra*, 97 Cal.App.5th at p. 445.) This is conveyed through the way in which related provisions in the statute work in tandem: "Subdivision (c)(1) first sets forth the controlling 'furtherance of justice' standard for dismissal," and "[s]ubdivision (c)(2) then states that the court must give great weight to the presence of any one or more of the nine listed mitigating circumstances '[i]n

41

exercising its discretion' whether to dismiss." (*Ibid.*) Finally, "[s]ubdivision (c)(3) confirms the discretionary nature of [the] dismissal] decision by stating that the court 'may exercise its discretion at sentencing' but is not prevented 'from exercising its discretion' earlier in the proceedings." (*Ibid.*) Thus, the "shall be dismissed" language of the mitigating circumstances in subdivisions (c)(2)(B) and (c)(2)(C)—read in context—only requires the court to dismiss the relevant enhancement if it first finds the dismissal would not endanger the public *and* that doing so would be "in the furtherance of justice" (§ 1385, subd. (c)(1)). (See *Mazur,* at pp. 444–445.)

Apparently recognizing the rising tide of authority rejecting the idea that section 1385, subdivision (c)(2)(C), *requires* dismissal of any enhancement that would result in a sentence of more than 20 years, Martinez does not argue the statute should be read as mandating dismissal of the section 12022.53, subdivision (d) enhancement. Instead, he contends the People's argument misconstrues what the trial court actually did at his sentencing. According to Martinez, the record can be read as demonstrating the trial court understood it had discretion under section 1385, subdivision (c)(2)(C) to impose the enhancement, but decided it would exercise its discretion to dismiss the enhancement. Martinez highlights that at an earlier point in the hearing, the court made a reference to section 1385's consideration of a defendant's danger to the public as a reason to " 'not consider giving the person a lesser sentence.' " Martinez argues this demonstrates the court understood that a finding that a defendant would be a danger to the public would mean that no dismissal of an enhancement was warranted.

Martinez further contends other portions of the trial court's remarks can "fairly be read to show that it understood the scope of its discretion under

section 1385, subdivision (c)," and it chose to dismiss the section 12022.53, subdivision (d) enhancement "in the interest of justice." To demonstrate this, Martinez relies on the fact the trial court discussed that Martinez had proved the existence of two of the mitigating factors set out in section 1385, subdivision (c): (1) imposition of an enhancement would result in a sentence longer than 20 years (§ 1385, subd. (c)(2)(C)), and (2) Martinez was a juvenile when he committed the offenses (§ 1385, subd. (c)(2)(G)). He then contends the court also "implicitly" found the existence of two additional mitigating factors—childhood trauma and mental illness. In Martinez's view, "the trial court's discussion of the mitigating factors of defendant's childhood trauma, mental illness, and status as a juvenile when he committed the crimes" indicates that the court relied on these factors, gave them great weight, and then made a "judgment that dismissing the enhancement would further the interest of justice."

We disagree with Martinez's reading of the record. Martinez's assertions about the trial court's statements fail to acknowledge the court had multiple firearm enhancements to consider, many of which did not involve sentences that would have led to a term of more than 20 years. The most reasonable reading of the court's references to the public safety consideration, as well as the other potentially mitigating factors set out in section 1385, subdivision (c), is that the court was considering these factors to decide whether to impose or dismiss the *other* firearm enhancements found true by the jury, not the section 12022.53, subdivision (d) enhancement. But when the court discussed the section 12022.53, subdivision (d) enhancement, specifically, it expressed its belief that it could not impose a sentence greater than 20 years on any particular count. The court said: "I mean, to me, I think the way I read the statute is that *I don't have a choice.* When I'm

43

talking about the gun allegation [of section 12022.53, subdivision (d)], *I don't have a choice but to reduce it.* [¶] . . . And my reading of the statute is that [if the] total term with the crime and the enhancement is more than 20 years, then I can't—it adds up to more than 20 years, then *I can't* [impose it]." (Italics added.) There is no room for interpretation. The record demonstrates the trial court believed it did not possess the discretion to do anything other than dismiss the section 12022.53, subdivision (d) enhancement.

An abuse of discretion occurs when a trial court is not aware of the scope of its sentencing discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 378.) Because of this, a court "*necessarily* abuses its discretion when it fails to exercise its discretion." (*People v. Choi* (2021) 59 Cal.App.5th 753, 766.) Here, because the trial court was unaware it retained discretion to impose the section 12022.53, subdivision (d) enhancement, its dismissal of that enhancement under the misapprehension it had no discretion to do otherwise constituted an abuse of discretion.

Further, the error requires reversal of the sentence and remand for the trial court to exercise its discretion in connection with the section 12022.53, subdivision (d) enhancement. "[T]here is a practical difference in assessing the effect of an error when the court has not articulated whether a discretionary decision was made in the first place, as compared to when there were errors in a decision the court actually rendered." (*In re F.M.* (2023) 14 Cal.5th 701, 716.) This is because where a sentencing court was not aware of the scope of its discretionary powers at sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the true scope of its discretionary powers at the time of sentencing. (*People v. Salazar* (2023) 15 Cal.5th 416, 425.) Therefore, where a court does not undertake to exercise its discretion, " 'the

44

appropriate remedy is to remand for resentencing unless the record "*clearly indicate*[*s*]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion.' " (*Ibid.*, italics added.)

Here, the court offered no hint it would have imposed the same sentence if, under an alternative view of the meaning of section 1385, it possessed discretionary power to impose the section 12022.53, subdivision (d) enhancement. And we cannot glean such an indication from other aspects of the sentencing hearing. For example, the trial court did not dismiss the section 12022.5, subdivision (a) enhancements, despite the presence of other mitigating circumstances, suggesting the court either determined public safety or the interests of justice warranted their imposition. Under these circumstances, we would have to engage in speculation to conclude that the court would have exercised its discretion by dismissing the section 12022.53, subdivision (d) enhancement if it had known it had authority to impose the enhancement despite the "shall be dismissed" language. We therefore conclude the trial court's erroneous misapprehension of section 1385, subdivision (c) as requiring dismissal of the section 12022.53, subdivision (d) enhancement necessitates that Martinez's sentence be vacated and the matter remanded for resentencing. On remand, the trial court shall exercise its discretion under section 1385, subdivision (c)(2) in connection with the section 12022.53, subdivision (d) enhancement. We express no view on how the trial court should exercise this discretion on remand.

## DISPOSITION

Martinez's sentence is vacated. The judgment is affirmed in all other respects. The matter is remanded for the trial court to hold a new sentencing hearing. On remand, the court shall also determine whether Martinez has an ability to pay the fines and fees challenged on appeal before reimposing them.

                                                                  DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.